UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LAURA ALLEN, INDIVIDUALLY; And As
ADMINISTRATRIX OF THE ESTATE
OF DANIEL ALLEN; And As NEXT FRIEND
OF TAYLOR ALLEN AND DANIELLE ALLEN;
And MARK ALLEN,

Plaintiffs

vs.                                              No. 05-40048-FDS

MARTIN SURFACING, A Division of
SOUTHWEST RECREATIONAL
INDUSTRIES; SOUTHWEST RECREATIONAL
INDUSTRIES, INC., d/b/a
MARTIN SURFACING,

Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DEFENDANTS' DAUBERT MOTION FOR SUMMARY JUDGMENT
### and/or
### TO PRECLUDE PLAINTIFF'S EXPERT TESTIMONY
### OF WILLIAM EWING

Now comes the Defendant, Southwest Recreational Industries, Inc. (hereinafter

"Defendant") and hereby moves this Honorable Court to preclude the Plaintiff from

introducing expert witness William Ewing and grant it summary judgment.

As reasons wherefore, the Defendant states the following

1

**CONCISE STATEMENT OF MATERIAL FACTS GENERALLY NOT IN
DISPUTE VIEWED IN THE LIGHT MOST FAVORABLE TO THE PLAINTIFF
PURSUANT TO LR 56.1**

## I. Introduction

This is a toxic tort case. It arises from a wrongful death claim, pursuant to M.G.L.

c.229 §2. The Plaintiff, Laura Allen, asserts that the death of her late husband, Daniel

Allen, was hastened by the negligent and/or grossly negligent application of the

gymnasium floor by the Defendant, in the field house at the College of the Holy Cross in

late May early June 2001. See attached Plaintiff's Third Amended Complaint, "Exhibit

A", hereinafter "Complaint".  The plaintiffs make thirteen (13) claims against the

Defendants as follows: General Negligence; Negligent Failure to Warn; Loss of

Consortium and for Other Relief Available under G.L. c. 229; Conscious Pain and

Suffering; Wrongful Death Caused by Grossly Negligent Conduct; Violation of M.G.L.

c.93A; Wrongful Conduct; Strict Liability; Breach of Express Warranty; Breach of

Implied Warranty; Negligent Infliction of Emotional Distress; Intentional Infliction of

Emotional Distress; and Defective Design, Manufacturing and Distribution.  Complaint.

Mr. Allen was diagnosed with ALS in January 2002 by Drs. Chad and Russell. See

Rule 26 Opinion of Dr. Christine Oliver, attached as "Exhibit B", hereinafter "Oliver

Opinion".  He passed away on May 16, 2004, and no autopsy was performed. See Death

Certificate, attached as "Exhibit C".

The National Institute of Neurological Disorders and Stroke define ALS as follows:

> Amyotrophic lateral sclerosis (ALS), sometimes called Lou Gehrig's
> disease, is a rapidly progressive, invariably fatal neurological disease that attacks
> the nerve cells *(neurons)* responsible for controlling voluntary muscles.  In ALS,
> both the upper motor neurons and the lower motor neurons degenerate or die,
> ceasing to send messages to muscles. Unable to function, the muscles gradually
> weaken, waste away, and twitch. Eventually the ability of the brain to start and

2

control voluntary movement is lost. Individuals with ALS lose their strength and the ability to move their arms, legs, and body. When muscles in the diaphragm and chest wall fail, individuals lose the ability to breathe without ventilatory support. The disease does not affect a person's ability to see, smell, taste, hear, or recognize touch, and it does not usually impair a person's thinking or other cognitive abilities. However, several recent studies suggest that a small percentage of patients may experience problems with memory or decision-making, and there is growing evidence that some may even develop a form of dementia. *The cause of ALS is not known, and scientists do not yet know why ALS strikes some people and not others.* (emphasis supplied)

NINDS Amyotrophic Lateral Sclerosis Information Page, http://www.ninds.nih.gov/disorders/amyotrophiclateralsclerosis/amyotrophiclateralsclerosis.htm; see also Rule 26 Opinion of Dr. Marcia Ratner p.8-9, attached as "Exhibit D", hereinafter "Ratner Opinion".

Experts for both the plaintiffs and the defendant agree that there are two forms of ALS: familial, which compromises approximately 20% of ALS patients and is associated with genetics; and sporadic, which has no known case. Ratner Opinion p.9. As Mr. Allen had no known family history of ALS, the plaintiffs' experts agree (and the defendants do not dispute) the decedent developed Sporadic ALS. Ratner Opinion 33, Oliver Opinion p.10.

The Defendants object to the testimony of Dr William Ewing based upon qualifications and Daubert standards and in accordance with the Federal Rules of Evidence.

## II. Opinions of William Ewing

### 1.    William Ewing, Industrial Hygienist

Firstly, Ewing admits: "It is not possible to predict with any degree of accuracy the amount of air that moved from the gymnasium to the upper office area where Coach Allen was located based solely on the ventilation design for the building and the conflicting recollections of the witnesses." Ewing Opinion p.4 para. 3. Nevertheless,

using inductive reasoning Ewing opines: "It is clear that significant concentrations of volatile organic vapors ("VOCs") did migrate to Coach Allen's office and other offices on his corridor based on the symptoms experienced by Mr. Allen and his co-workers. The specific symptoms of headache, dizziness, and nausea demonstrate concentrations likely to be well in excess of documented order threshold values reported by the American Hygiene Association ("AIHA")." <u>Ewing Opinion</u> p.4 para. 3.  However, Ewing admits: "I have requested any air sampling data that might have been collected during the floor refinishing project at the field house in 2001. ..... I understand none were taken at the Holy Cross field house project." <u>Ewing Opinion</u> p.10 para. 2.  In a footnote, Ewing admits: "I understand some air sampling was conducted approximately 15 months later in the field house. It is unlikely these results, should they become available, will be helpful in retrospectively establishing exposures from May – June 2001." <u>Ewing Opinion</u> p.10 footnote 15. Yet, despite the lack of any foundation from which to opine as to the alleged levels of solvent vapors present during the field house floor refinishing; Ewing asserts: " ...[I]t is my opinion to a reasonable degree of scientific certainty that Coach Dan Allen and some of his co-workers present in the field house during the gymnasium floor resurfacing were exposed to significant concentrations of solvent vapors during at least three days of the work." <u>Ewing Opinion</u> p.11 para. 6.  However, he concedes: "based on the information reviewed to date, it is not possible for me to conclude whether Mr. Allen's exposure to any particular chemical was in excess of the PEL or TLV." <u>Ewing Opinion</u> p.11 & 12. Yet again without any scientific foundation Ewing asserts: "However, it is likely that Mr. Allen's exposure to this mixture of solvents known to act

on the central nervous system approached or exceeded the PEL and TLV for the mixture." Ewing Opinion p.12.

## LEGAL ARGUMENT

### I.    Summary Judgment Standard

Federal law controls the procedural aspects of a diversity case, and therefore the grant of summary judgment is controlled by Fed.R.Civ.P. 56, as interpreted in the federal courts. Hammer v. Slater, 20 F.3d 1137, 1140 (11th Cir. 1994).

The "judge's function" at the summary judgment stage is to determine whether there is a "genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 106 S.Ct.1348, 1356 (1986); accord Liberty Lobby, supra ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). It follows that "some metaphysical doubt as to the material facts" will not suffice to forestall summary judgment. Matsushita, supra. Similarly, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." Liberty Lobby, 477 U.S. at 252.

The question of whether expert testimony is required is a substantive one, and federal courts operating under diversity jurisdiction apply state law on the issue. In Re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 751 (3d Cir. 1994).

It is well established that where expert testimony is required, summary judgment must be granted on those claims for which the plaintiff is unable to provide such expert

testimony.   See Polaino v. Bayer Corporation, 122 F.Supp.2d 63 (D.Mass 2000).  For

the reasons set forth herein, and those set forth in the all of the defendant's motions for

summary judgment, which are incorporated as if expressly set forth herein, the plaintiff

has failed to produce expert testimony which is admissible.

III.    **Gate Keeper Function of the Court Regarding Scientific Opinion Evidence**

When determining whether to admit expert testimony, duty of trial judges is to

play the role of "gatekeeper," insuring that fact-finding process does not become

distorted by what is popularly called "junk science," and this role is especially sensitive

in cases where the plaintiff claims that exposure to toxic substance caused his injury as a

jury may blindly accept expert's opinion that conforms with their underlying fears of

toxic substances without carefully understanding or examining basis for that opinion.

Whiting v. Boston Edison Company, 891 F.Supp.12, 24 (D.Mass 1995) (hereinafter

"Whiting"); citing O'Connor v. Commonwealth Edison Co., 807 F.Supp. 1376, 1391

(C.D.Ill. 1992).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

(hereinafter "Daubert"), the Supreme Court established guidelines for district courts to

use in determining the admissibility of expert testimony pursuant to Rules 702 and 104

of the Federal Rules of Evidence (FRE). Although it recognized that the evaluation of

expert testimony is generally left to juries, the Court emphasized the trial judge's

"gatekeeping" role with respect to expert proof on scientific issues. Id. at 597-98 (citing

FRE 104(a)).

6

Currently two gateposts frame the exercise of a judge's discretion. First a witness must be shown to be sufficiently qualified by "knowledge, skill, experience, training, or education" before he will be permitted to give expert testimony. Whiting at 24 quoting Fed.R.Evid. 702. Second, the court must establish "any and all scientific evidence admitted is not only relevant, but reliable." Id. quoting Daubert at 589.

To qualify as an expert under Rule 702, a witness must first establish his expertise by reference to "knowledge, skill, experience, training, or education." Fed. R. Evid. 420. Although this requirement has always been treated liberally, liberal interpretation of this requirement "does not mean that a witness is an expert simply because he claims to be." In re Paoli RR Yard PCB Litigation, 916 F.2d 829, 855 (3d Cir. 1994).

Although there is no single criterion for determining whether a specific scientific methodology is reliable, the Daubert Court identified several factors that a district court should consider when evaluating the scientific validity of expert testimony, notably: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community. Daubert at 593-94.

In addition to requiring that a proposed expert's testimony be "reliable," Rule 702 requires that the expert's testimony assist the trier of fact. This requirement has been interpreted to mean that scientific testimony must "fit" the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the

disputed factual issues in the case in which the expert will testify. <u>Daubert</u> at 592. In

short, under <u>Daubert</u> and its progeny, a party proffering expert testimony must show by a

"preponderance of proof" that the expert whose testimony is being offered is qualified

and will testify to scientific knowledge that will assist the trier of fact in understanding

and disposing of issues relevant to the case. <u>Id.</u> at 592.

IV.   **Ewing Does Not Have Sufficient Knowledge, Skills, Experience, Training or
      Educations Related to the Subject Matter at Hand, and Therefore Are Not
      Qualified to Provide an Expert Opinion**

William Ewing does not have sufficient knowledge, skills, experience, training, or

educations related to the subject matter at hand, and therefore are not qualified to make

an expert opinion.

Federal Rule 702 provides: if scientific, technical, or other specialized knowledge

will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education,

may testify thereto in the form of an opinion or otherwise. <u>Akerson v. Falcon Transport

Co.</u>, Slip Copy 2006 WL 3377940, 4 (D.Me. 2006);<u>Taylor v. Airco, Inc.</u>, 494 F.Supp.2d

21, 22 (D.Mass. 2007).

A witness must be qualified in the *specific* subject for which his testimony is

offered.  <u>Whiting</u> at 24.  "Just as a lawyer is not by general education and experience

qualified to give an expert opinion on every subject of the law, so too a scientist or

medical doctor is not presumed to have expert knowledge about every conceivable

scientific principle or disease." <u>Id.</u>

The advisory committee notes to FRE 702 explain other factors that a court may

consider, including: (1) whether the experts are "proposing to testify about matters

growing naturally and directly out of research they have conducted independent of

litigation, or whether they have developed their opinions expressly for the purpose of

testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise

to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious

alternative explanations. FED. R. EVID. 702 advisory committee's notes.


### A.   The Opinion of William Ewing Does Not Assist the Trier of Fact

In order to be admissible, the expert testimony offered by the plaintiff must assist

the jury, by providing it with relevant information, necessary to a reasoned decision of

the case. Magistrini, 180 F. Supp. 2d 584, 595 (D.N.J. 2002) (quoting U.S. v.Velasquez,

64 F.3d 844, 850 (3d Cir. 1995) ("The ultimate touchstone of admissibility is helpfulness

to the trier of fact."); In re Rezulin, 369 F. Supp. 2d 398, 420 (S.D.NY. 2005) (this

consideration is bound up with the relevancy requirement described in Daubert as one of

"fit"); see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994) ("The

standard for fit is higher than bare relevance").  Scientific expert testimony introduces

special dangers to the fact-finding process because it "can be both powerful and quite

misleading because of the difficulty in evaluating it." Daubert, 509 U.S. at 595 (internal

quotation marks and citation omitted). Therefore, "federal judges must exclude proffered

scientific evidence under Rule 702 unless they are convinced that it speaks clearly and

directly to an issue in dispute in the case, and that it will not mislead the jury." Cloud v.

Pfizer, Inc., 198 F. Supp. 2d 1118, 1130 (D. Ariz. 2001) (citing Daubert II, 43 F.3d 1311,

1321).

Ewing can not express his opinion in terms which would assist the trier of fact in this matter. Ewing by his own admission is without any knowledge regarding the duration or concentration of toluene to which Mr. Allen was exposed, and therefore he cannot assert that they were sufficient to cause toxic effects. Thus, his opinion should be stricken. Allen v. PA Engineering Corp., 102 F.3d 194, 198 (5th Cir. 1996).

## B. Specific Causation

Specific Causation simply means that the substance in fact caused the injury. Callahan v. U.S., 426 F.3d 444, 452 (D.Mass. 2005). The court should not admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion preferred." Polaino v. Bayer Corporation, 122 F.Supp.2d 63, 67 (D. Mass 2000); quoting General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). "Rather, trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Id. quoting Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998).

Where an expert witness testifies that a causal relationship is "possible," "conceivable" or "reasonable," that opinion, standing alone, does not satisfy a plaintiff's burden of adducing legally sufficient proof that a fact is more likely true than not. Id. citing Rotman v. National Railroad Passenger Corp., 41 Mass.App.Ct. 317, 320 (1996).

### 1. There is no material fact in record that quantifies the level or duration of Mr. Allen's exposure to toluene

Expert testimony should not be based upon temporal proximity and anecdotal evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1312 (11th cir. 1999) Firstly,

Ewing admits: "It is not possible to predict with any degree of accuracy the amount of air that moved from the gymnasium to the upper office area where Coach Allen was located based solely on the ventilation design for the building and the conflicting recollections of the witnesses." Ewing Opinion p.4 para. 3.  Nevertheless, using inductive reasoning Ewing opines: "It is clear that significant concentrations of volatile organic vapors (VOCs) did migrate to Coach Allen's office and other offices on his corridor based on the symptoms experienced by Mr. Allen and his co-workers. The specific symptoms of headache, dizziness, and nausea demonstrate concentrations likely to be well in excess of documented order threshold values reported by the AIHA (American Hygiene Association)." Ewing Opinion p.4 para. 3.   However, Ewing admits: "I have requested any air sampling data that might have been collected during the floor refinishing project at the field house in 2001. ….. I understand none were taken at the Holy Cross field house project." Ewing Opinion p.10 para. 2.   In a footnote, Ewing admits: "I understand some air sampling was conducted approximately 15 months later in the field house. It is unlikely these results, should they become available, will be helpful in retrospectively establishing exposures from May – June 2001." Ewing Opinion p.10 footnote 15. Yet, despite the lack of any foundation from which to opine as to the alleged levels of solvent vapors present during the field house floor refinishing; Ewing asserts: "…[I]t is my opinion to a reasonable degree of scientific certainty that Coach Dan Allen and some of his co-workers present in the field house during the gymnasium floor resurfacing were exposed to significant concentrations of solvent vapors during at least three days of the work." Ewing Opinion p.11 para. 6.  However, he concedes: "[B]ased on the information reviewed to date, it is not possible for me to conclude whether Mr. Allen's exposure to

any particular chemical was in excess of the PEL or TLV." <u>Ewing Opinion</u> p.11-12. Yet

again without any scientific foundation, Ewing asserts: "however, it is likely that Mr.

Allen's exposure to this mixture of solvents known to act on the central nervous system

approached or exceeded the PEL and TLV for the mixture." <u>Ewing Opinion</u> p.12.

Ewing's opinion is precisely the type of speculative guesswork that is inadmissible.

<u>Hammond v. Coleman Co., Inc.</u>, 61 F.Supp.2d 533, 540 (S.D.Miss. 1999). Expert

testimony must be excluded when it rests on unverified assumption, speculation and

guesswork. <u>Polaino</u> at 69 (expert failed to investigate facts upon which hypothesis was

based in case regarding alleged toxic exposure from x-ray processor when did not

investigate (1) how mixer was vented; (2) whether the chemicals are processed in an open

or closed system; (3) the temperature at which the mixer operates; (4) whether fumes are

in fact released when equipment is operate with undiluted chemicals; and (5) if they are,

whether they are released at elevated levels).

Ewing is unable to provide an opinion of the length, the extent, or the amount of

toluene that Mr. Allen was allegedly exposed to in late May/June 2001. The only

evidence that Ewing can point to concerning Mr. Allen's alleged exposure is: "It is clear

that significant concentrations of volatile organic vapors (VOCs) did migrate to Coach

Allen's office and other offices on his corridor based on the symptoms experienced by

Mr. Allen and his co-workers. The specific symptoms of headache, dizziness, and nausea

demonstrate concentrations likely to be well in excess of documented order threshold

values reported by the AIHA." <u>Ewing Opinion</u> p.4 para. 3. Yet this opinion is anecdotal

and should be stricken. <u>Soldo v. Sandoz Pharmaceuticals Corp.</u>, 244 F.Supp.2d 434, 537

(W.D.Pa. 2003).

Moreover, Ewing's opinion was created exclusively for use in this litigation. Such opinions are disfavored by the drafters of the Federal Rules of Evidence. FED. R. EVID. 702 advisory committee's notes. Because Ewing admits: : "I have requested any air sampling data that might have been collected during the floor refinishing project at the field house in 2001. ..... I understand none were taken at the Holy Cross field house project." Ewing Opinion p.10 para. 2. In a footnote, Ewing also admits: "I understand some air sampling was conducted approximately 15 months later in the field house. It is unlikely these results, should they become available, will be helpful in retrospectively establishing exposures from May – June 2001." Ewing Opinion p.10 footnote 15. Thus, Ewing's opinion is without foundation and does not rise to the level of reliability necessary to comport with the Federal Rules of Evidence 702 and 703 and the mandates of Daubert. He further concedes: (contrary to the speculative opinions of Oliver) "Based on the information reviewed to date, it is not possible for me to conclude whether Mr. Allen's exposure to any particular chemical was in excess of the PEL or TLV." Ewing Opinion p.11-12.

Wherefore the Defendant respectfully requests this Honorable Court to preclude the Plaintiff from introducing opinion testimony expert William Ewing, and grant it summary judgment.

Dated: November 1, 2007

Respectfully submitted,
The Defendant,
Southwest Recreational Industries,
Inc. d/b/a Martin Surfacing

/s/ Michael L. Mahoney

Michael L. Mahoney
Mullen & McGourty
52 Temple Place, 4th Floor
Boston, MA 02111
(617) 338-9200
BBO# 557562

## CERTIFICATE OF SERVICE

I, Michael L. Mahoney, hereby certify that I have served a true copy of the within document this 1st day of November, 2007 via email, upon the following:

Anthony Tarricone , Esq.
James Gotz, Esq.
Kreindler & Kreindler, LLP
277 Dartmouth Street
Boston, MA 02116

Michael Hugo, Esq.
Ian McAllister, Esq.
Brent Coon & Associates
277 Dartmouth Street , 4th Floor
Boston , MA 02116

/s/ Michael L. Mahoney

Michael L. Mahoney

14